UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMERITAS LIFE INSURANCE CORP., **Plaintiff,** v. **WILMINGTON SAVINGS FUND SOCIETY, FSB, as Securities Intermediary,** **Defendant.** | Civ. No. 2:24-cv-00865 (WJM) **OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

Presently in this action for declaratory judgment, Ameritas Life Insurance Corp. ("Ameritas" or "Plaintiff") and Wilmington Savings Fund Society, FSB, as Securities Intermediary ("WSF" or "Defendant") each move for summary judgment pursuant to Fed. R. Civ. P. 56. ECF Nos. 56, 58, respectively. The Court decides this motion after hearing oral argument on May 27, 2026. For the reasons below, Plaintiff's motion for summary judgment is **granted.** Defendant's motion for summary judgment is **denied.** The premium refund request is **granted in part and denied in part.**

## I.   BACKGROUND AND PROCEDURAL HISTORY

Ameritas is a life insurance company incorporated under the laws of Nebraska with its principal place of business in Nebraska. Amended Compl. ¶ 1, ECF No. 9. WSF is a federal savings bank with its main office and principal place of business in Delaware. *Id.* ¶ 2. WSF is the defendant in this case solely as securities intermediary for the Kolel Beth Yechiel Mechil of Cong. Kahal Minchas Chinuch of Tartikov ("Kolel"). Def. Supp'l. Stmt. of Disputed Material Facts ("DSSDMF") ¶ 3, ECF No. 61-1.

Alexander Bienenstick ("Bienenstick" or "Insured") was a long-standing supporter of the Kolel. Aff. of Chaim Shia Babad ("Babad Aff.") ¶ 5, ECF No. 58-3; DSSDMF ¶ 26. The Kolel is a registered non-for-profit entity pursuant to § 501(c)(3) of the Internal Revenue Code of 1986. Babad Aff. ¶ 4. Chaim Shia Babad is the President and founder of Kolel. *Id.* ¶ 2. Babad and Bienenstock, having worked together previously, agreed that the Kolel would procure a life insurance policy on Bienenstock's life ("Policy"), pay all premiums, and receive the death benefit upon his death ("Agreement"). *Id.* ¶ 6; Babad Video Dep. Tr. ("Babad Tr.") 52:7-14, 53:12-22, Decl. of Duncan Becker in Supp. of Pl. Mot. for SJ ("Becker Decl.") Ex. 1, ECF No. 56-5.

On February 20, 2008, the Alexander Bienenstock Life Insurance Trust ("Trust") was created, naming Michael S. Mosberg, Esq. ("Mosberg") as Trustee. Trust Agmt.,

1

Becker Decl., Ex. 4, ECF No. 56-8. The Trust documents were prepared by an attorney who has since passed away. DSSDMF ¶ 7; ECF No. 61-1. In the Trust Agreement,[1] Bienenstock is listed as Grantor and Bienenstock's wife, Sandra, as Beneficiary. *See* Trust Agmt; Def. Resp. to Pl. Stmt. of Undisputed Material Facts ("DRSUMF") ¶ 4, ECF No. 61-1. Although the Trust was established and fully funded by the Kolel, the Trust Agreement contains no mention of the Kolel. Babad Aff. ¶ 11.

In March 2008, Ameritas's predecessor-in-interest Union Central Life Insurance Company ("Union Central") received an application ("Application") seeking a $5 million policy for insurance that was signed by Bienenstock (as proposed insured), Mosberg (as Trustee of the Trust identified as owner), and Abraham Leifer ("Leifer") (as licensed soliciting agent). *See* Application, Becker Decl. Ex. 5, ECF No. 56-9. The cover letter to the Application is signed by Leifer and states that the insurance is "needed for estate taxes and to avert the need to liquidate assets" and that "[p]remiums will be paid from his liquid assets." *Id.* at 663. The Application named the Trust as the Policy's prospective owner and beneficiary, and requested that premium notices be sent to the owner (Mosberg as Trustee). *Id.* 76, 78. The Kolel is not named as the Policy's owner or beneficiary nor did it sign or otherwise join in the Application; the Application makes no mention of the Kolel or the Agreement at all. *See* Application. Babad did not know that Leifer failed to disclose that the Kolel was paying the premiums. Babad Aff. ¶ 17. He also testified that during the application process, the Kolel did not disclose to the insurer its involvement or the Agreement he had with Bienenstock because he believed that it was unnecessary to do so. Babad Tr. 84:19-85:4.

In a "Statement of Policyowner and Agent Intent," Mosberg (on behalf of the Trust), Bienenstock (as insured), and Leifer (as agent), represented to Union Central that there was no present intent to sell or assign the insurance policy for which the application was made, that there were no discussions with an individual or company offering to pay for the life insurance policy, and that there was no intent to finance the premiums or to sell or assign the policy to a third-party. Becker Decl. Ex. 6, ECF No. 56-10. On or about April 1, 2008, Union Central received a "Report Summary" stating that the purpose of the insurance policy was "family protection" (Question 91) and reiterating that Bienenstock did not "presently intend to assign or sell the life insurance policy," that Bienenstock had not "spoken with an individual or company offering to pay [him] for [his] life insurance policy," and that the premiums were not "being financed in any way." Becker Decl. Ex. 7 at 3981-82, ECF No. 57-1.

On April 25, 2008, Union Central issued the Policy (number U000042887) with a $5 million death benefit insuring the life of Bienenstock. Policy, Becker Decl. Ex. 8, ECF No. 56-11. For roughly the first three years, the Kolel paid the premium payments, including the initial premium payment, into the Trust account, which in turn paid the

---

[1] Defendant contends that the Trust Agreement provided by Plaintiff is unsigned and materially differs from the executed trust instrument in naming a different beneficiary but does not submit a copy of the trust instrument it references. *See* Def.'s Resp. to Pl. Stmt. of Undisputed Facts ¶ 4.

insurer by check. Babad Tr. 98:7-19; Babad Aff. ¶ 12; Becker Decl. Ex. 12, ECF No. 56-15. The Policy states: "This policy is a legal contract between *you* and Union Central" and defines "*you*" as "the owner of this policy." Policy at 000001, 000009. "Owner" is "the *owner* named in the application, unless changed," which was the Trust. *Id.* 000009, 000025. The owner's rights include "the right to change the *owner* or beneficiary" and further explains that the owner "may change the beneficiary at any time before the *insured* dies by *notice* to us." *Id.* at 000012, 000023 (emphases in original).

According to a March 2011 "Purchase and Sale Agreement," the Kolel was to sell its portfolio, including the Policy, to YLL Irrevocable Trust ("YLL"). Purchase and Sale Agmt., Becker Decl. Ex. 16, ECF No. 56-19. In May 2011, at the request of the Trust, the Insurer confirmed that the Policy's owner was changed to Life Settlement Solutions ("LSS"), an affiliate of YLL, and the beneficiary was changed to the Kolel. *Id.* Ex. 17, ECF No. 56-20. Ultimately though, the arrangement with LSS fell through. DSSDMF ¶ 8 n.1. Hence in June 2011, the Insurer received additional requests to change the Policy's owner from LSS to WSFS, as securities intermediary, and to change the Policy's beneficiary from the Kolel to WSFS, as securities intermediary. Becker Decl. Ex. 18, ECF No. 56-21. The Insurer subsequently confirmed these requested changes. *Id.* WSF is the Kolel's "agent," and merely a servicer of the Policy; the Kolel is "really the owner" of the Policy. Babad Tr. 42:23-43:20. Thereafter, starting in July 2012, the Kolel paid the premiums by check directly to the Insurer. *See* Decl. of David BenHaim, Ex. C, ECF No. 58-7. The Kolel funded all the premium payments on the Policy and in total has paid $2,142,925.17.[2] Babad Aff. ¶13.

Notwithstanding that the "owner" and beneficiary named in the Policy has varied, the Trust held the Policy on behalf of the Kolel, which has always been the effective owner and beneficiary of the Policy. Def. Stmt. of Undisputed Material Facts ("DSUMF") ¶¶ 3, 5. As agreed to by Babad and Bienenstock, the Policy was taken out with the intent that the Kolel would ultimately receive the Policy's death benefit when Bienenstock died. *Id.* ¶ 3, ECF No. 58-2; Def. Interrog. Resp. ¶¶ 2, 8, Becker Decl. Ex. 13, ECF No. 56-16; Def. Resp. to Requests for Admission ¶ 1, Becker Decl. Ex. 14, ECF No. 56-17. Bienenstock passed away on January 12, 2024. Becker Decl. Ex. 21, ECF No. 56-24. Thereafter, WSF submitted a claim for the Policy's death benefit. *Id.*

On February 15, 2024, Plaintiff filed this action seeking a declaration that the Policy is void *ab initio* for lack of insurable interest at inception and now moves for summary judgment. WSF also moves for summary judgment seeking dismissal of the Amended Complaint and confirming its right, as securities intermediary, for the Kolel to receive the Policy's death benefit arguing that the Kolel had an insurable interest under N.J.S.A. §17B:24-1.1(a)(2), (4), and/or (5).

---

[2] The total premiums paid by the Kolel, as reflected in Ex. C of BenHaim's Declaration, was $2,050,487.79.

## II.      STANDARD AND BURDEN OF PROOF

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A fact is 'material' . . . if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of New York & New Jersey*, 593 F.3d 265, 268 (3d Cir. 2010). The Court's role at the summary judgment stage "is 'not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Anderson*, 477 U.S. at 249).

The party moving for summary judgment bears the initial burden of showing the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden then shifts to the non-moving party to "come forward with specific facts showing that there is a *genuine issue for trial* and do more than simply show that there is some metaphysical doubt as to the material facts." *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (emphasis in original and internal quotation marks omitted). "[U]nsupported assertions, speculation, or conclusory allegations" are insufficient to defeat a summary judgment motion. *Longstreet v. Holy Spirit Hosp.*, 67 F. App'x 123, 126 (3d. Cir. 2003). "[T]here must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.      DISCUSSION

### A. Insurable Interest

Under New Jersey law,[3] a life insurance policy may be issued where the death "benefits under that contract are payable to the individual insured or his personal representative, or to a person having, at the time when that contract was made, an *insurable interest* in the individual insured." N.J.S.A. § 17B:24-1.1(b) (emphasis added)). An individual has an insurable interest in his own life, in the life of another who is closely related by blood or by law, or in "another individual if he has an expectation of pecuniary

---

[3] Defendant does not challenge Plaintiff's position that New Jersey law applies and itself also applies New Jersey law. Thus the Court assumes, as do the parties, that New Jersey law governs.

advantage through the continued life" of that person and "consequent loss" from his death or disability. N.J.S.A. § 17B:24-1.1(a)(1)-(3). As long as the policy originated with an insurable interest at its inception, valid life insurance policies are assets that can be sold in a secondary market at least two years after issuance or earlier in certain cases. *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 238 N.J. 157, 185-86 (2019) ("*Bergman*").

In contrast, "stranger-originated life insurance" or "STOLI" is the "act, practice or arrangement to initiate or procure the issuance of a policy in this State for the benefit of a third-party investor who, at the time of policy inception has *no insurable interest* under the laws of this State in the life of the insured." N.J.S.A. § 17B:30B-18(e)(1) (emphasis added). In a classic STOLI situation, from the outset, the "investors are the ultimate intended beneficiaries of the policy. ... [A] stranger who hopes the insured will die soon causes the policy to be procured and collects the death benefit." *Bergman*, 238 N.J. at 175. A contract is mere wager where "the party taking the policy is directly interested in the early death" rather than the continued life of the insured. *Warnock v. Davis*, 104 U.S. 775, 779 (1881). There is no insurable interest if a policy is procured as a cover for a wager on human life. *Sun Life Assurance Co. of Canada v. Wells Fargo*, No. 14-5789, 2016 WL 5746352, at *10 (D.N.J. Sept. 30, 2016); *Bergman*, 238 N.J. at 172 (noting a STOLI policy is essentially a "bet on a stranger's life." (citation modified)). Thus, STOLI transactions violate public policy and are void *ab initio*. *Bergman*, 238 N.J. at 190; N.J.S.A. § 17B:30B-18(b).

It is undisputed that at inception, the Kolel procured and paid for all the premiums on the Policy for which it was the intended beneficiary. Thus, by creating the Policy under a trust in the family name – the Alexander Bienenstock Life Insurance Trust, the Kolel feigned an insurable interest. *See* N.J.S.A. § 17B:30B-18(c) ("A trust that is created to give the appearance of an insurable interest and that is used to initiate or procure policies for investors shall be in violation of the insurable interest laws of this State and the prohibition against wagering on life."); *Bergman*, 238 N.J. at 174 ("If a third party without an insurable interest procures or causes an insurance policy to be procured in a way that feigns compliance with the insurable interest requirement, the policy is a cover for a wager on the life of another and violates New Jersey's public policy."). *See e.g., Sun Life*, 2016 WL 5746352 (finding STOLI arrangement lacked insurable interest in life of insured and void *ab initio* where policy application indicated that trust would pay insurance premiums and trustee of trust was insured's grandson, but policy was paid for through the trust by a group of investors who were strangers to the insured), *aff'd, Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 779 F. App'x. 927 (3d Cir. 2019) ("*Sun Life II*"); *see also Lincoln Nat'l Life Insur. Co. v. Retirement Value LLC*, No. 24-2663, 2026 WL 1679179 (3d Cir. June 10, 2026) (affirming district court's ruling that insurance policies were STOLI and void *ab initio* where the family trust was a nominal beneficiary and third-party investors without any relationship to the insured paid the premiums and would receive 90% of the death benefits).

5

To distinguish these cases, Defendant highlights that the Kolel was not an actual stranger and in fact, Bienenstock had a "deep, longstanding, and intergenerational" relationship with the Kolel. However, the existence of a STOLI arrangement or lack of insurable interest does not turn on whether the third-party investor is an *actual* stranger, but rather, whether the Kolel had an insurable interest at inception. According to Defendant, the Kolel had an "insurable interest" at inception under N.J.S.A. § 17B:24-1.1(a)(2), (4), and/or (5). For the reasons set forth below, the Court finds that at the time of policy inception, the Kolel did not have an insurable interest.

1. N.J.S.A. § 17B:24-1.1(a)(2)

Subsection (a)(2) states in pertinent part:

> (2) An individual has an insurable interest in the life, health and bodily safety of another individual if he has an expectation of pecuniary advantage through the continued life, health and bodily safety of that individual and consequent loss by reason of his death or disability. …

N.J.S.A. § 17B:24-1.1(a)2). The Kolel does not satisfy the requirements of an insurable interest under this provision. First, it is clear from the plain text of (a)(2) that that subsection governs when an "individual" has an insurable interest. *See* N.J.S.A. § 17B:24-1.1(a)(1) ("An individual has an insurable interest in his own life, health and bodily safety."). Because the Kolel is not an "individual" and Defendant offers no support to show that (a)(2) is applicable to an entity, that provision is inapplicable.

Second, even if (a)(2) did apply not just to "individuals," Defendant has not presented any evidence that suggests that the Kolel had "an expectation of pecuniary advantage through the continued life" of the Insured and "consequent loss by reason of" the Insured's death. To show "pecuniary advantage," Defendant insists that the Insured was a long-standing "financial and religious supporter" of the Kolel, *see* Def. Br. in Supp. of Summary Judgment ("Def. Moving Brief") 16, ECF No. 58-1; Babad Aff. ¶ 7 (referring to Insured as "major supporter"); DSSDMF ¶ 26 (describing Insured as "long-standing supporter" of Kolel) but offers *no* evidence of any of the Insured's financial support or contributions to the Kolel. That the Insured was an "active supporter" or that the Kolel honored the Insured's father with a plaque in its Manhattan temple, while admirable, does not demonstrate pecuniary or monetary support of the Kolel nor does it justify the Kolel's expectation of a "pecuniary advantage" through the Insured's continued life. *See* Def. Amended Resp. to Pl. First Set of Requests for Production of Documents ¶ 12, (objecting to request for documents showing "any fundraising or assistance provided by the Insured"), Becker Decl. Ex. 25, ECF No. 62-5. Lastly, the Court need not resolve the parties' disagreement on how financial "loss" is to be measured under (a)(2). Absent evidence of *any* "pecuniary advantage" through the Insured's life, a factfinder cannot determine that there was *any* "consequent loss" of pecuniary advantage from the Insured's death. In sum, no genuine issues of material fact exist upon which a jury could find that Kolel had an insurable interest under § 17B:24-1.1(a)(2).

6

### 2. N.J.S.A. § 17B:24-1.1(a)(4)

In relevant part, subsection (a)(4) provides:

(4) A corporation has an insurable interest: (a) in the life or physical or mental ability of any of its directors, officers, or employees, or … any other person whose death or physical or mental disability might cause financial loss to the corporation; …

N.J.S.A. § 17B:24-1.1(a)(4). Plaintiff argues that "any other person" necessarily refers to a corporate relationship — akin to a director, officer, employee, or shareholder — where the Insured's death might cause "financial loss to the corporation." The Court need not decide whether a corporate relationship is required because, as discussed above, apart from the bald assertion that the Insured was a long-standing "financial and religious supporter" of the Kolel, Defendant has not provided any evidence of *any* financial loss that the Insured's death might cause to the Kolel. Defendant raises no disputed material fact upon which a reasonable factfinder could find that the Kolel had an insurable interest under § 17B:24-1.1(a)(4).

### 3. N.J.S.A. § 17B:24-1.1(a)(5)

Subsection (a)(5), which applies specifically to charitable entities, provides in pertinent part:

A nonprofit or charitable entity qualified pursuant to section 501(c)(3) of the Internal Revenue Code of 1986 (26 U.S.C. § 501(c)(3)), … has an insurable interest in the life or physical or mental ability of its directors, officers, employees, supporters or their designees or others to whom it may look for counsel, guidance, fundraising or assistance in the execution of its legally established purpose, who either: (a) join with the entity in signing the application for insurance, which application names the entity as the owner and irrevocable beneficiary of the policy; or (b) after having been listed as owner, subsequently transfer ownership of the insurance to the entity and name the entity as the irrevocable beneficiary of the policy.[4]

N.J.S.A. § 17B:24-1.1(a)(5) (footnote added). The parties do not dispute that the Kolel is a 501(c)(3) charitable entity. But even if Bienenstock was "one of the Kolel's supporters," *see* Pl. Opp'n Br. 19, ECF No. 62, and was one to whom the Kolel looked to for "counsel, guidance, fundraising or assistance in the execution of its legally established purpose," that only satisfies the "supporter" or "others to whom [the charity] may look" prong of (a)(5).

---

[4] N.J.S.A. § 17B:24-1.1(a)(5)(b) is not at issue. The Insured was never listed as owner of the Policy.

7

For an insurable interest to exist under (a)(5), the Insured must have "joined" with the Kolel "in signing the application for insurance" which "names the [charitable] entity as the owner and irrevocable beneficiary of the policy." N.J.S.A. § 17B:24-1.1(a)(5). Defendant does not contest that the Kolel was not identified by name on the Application and none of the arguments it raises to excuse not having done so are compelling.

First, Defendant posits that this subsection only requires that the *insured* sign the Application. This interpretation ignores the plain statutory language that the insured "*join with the entity in signing* the application for insurance." Requiring the charitable entity to be joined is not, as Defendant characterizes it, a "constrained and forced" reading of (a)(5), *see* Def. Moving Br. at 17, but rather one that, "gives effect to all of the statutory provisions and does not render any language inoperative, superfluous, void[,] or insignificant." *Sanchez v. Fitness Factory Edgewater, LLC*, 242 N.J. 252, 261 (2020) (internal citation and quotes omitted). Ignoring the statute's plain language is contrary to the principles of statutory interpretation. *See id.* ("Our first step in interpreting a statute is to look to the actual words of the statute, giving them their ordinary and commonsense meaning." (internal quotation marks and citations omitted)).

Second, Defendant asserts that the Kolel effectively "joined" in signing because the Insured consented to the Kolel's procurement of the Policy. But Defendant fails to cite any legal basis to interpret "join in signing" as merely requiring an insured's "consent."

Third, Defendant claims that the legislature simply intended for an insured to be aware of and consent to a charity's procurement of insurance on the insured's life and that requiring direct naming would elevate form over substance. However, enforcing the statute as written ensures that both the insured as well as the insurer are aware of and consent to the charity's involvement. It is undisputed that here, the Kolel's involvement in funding the premiums and its role as intended or "actual" owner were not disclosed to the insurer during the application process. In fact, the initial Application, supporting documents, and the premium payments paid by check from the Trust gave the appearance that the Policy benefits would be payable to the Bienenstock's wife or family. Whether a charitable entity acted *intentionally* in omitting its involvement is not listed as a factor to consider when determining an insurable interest under (a)(5). Moreover, while Defendant points out that (a)(5) as well as Plaintiff's own policies permit a charitable entity to take out life insurance policies on the life of its supporters, that would have required the insurer to request additional information from the Kolel – such as documentation regarding the insured's past charitable giving, anticipated future contributions, and role within the charity – in order to assess whether the amount applied for was consistent with the anticipated loss. *See* Scott Corbett, R. 30(b)(6) Dep. Tr. 46:4-48:16, Becker Decl. Ex. 15, ECF No. 56-18.

Next, the Court also rejects Defendant's contention that the Kolel, while indisputably "not named directly on the application," nonetheless satisfies that requirement because the Kolel was *effectively* named on the Application as owner and beneficiary. Def. Reply Br. 6, ECF No. 65. Defendant offers no legal basis for such an interpretation.

8

Finally, for a charitable entity to have an insurable interest under (a)(5), the charity must not only be named as owner in the application but also as an "irrevocable beneficiary of the policy." N.J.S.A. § 17B:24-1.1(a)(5). According to Defendant, even though the Kolel was not identified as an "irrevocable beneficiary," it is *effectively* an "irrevocable beneficiary" because the Kolel "has at all times been the sole and ultimate beneficiary." Def. Reply Br. at 8. The term "irrevocable" means "unalterable" or "not capable of being revoked." IRREVOCABLE Definition & Meaning - Merriam-Webster. In this case, the beneficiary was clearly not irrevocable. The Application expressly states that the beneficiary is "[s]ubject to change by Owner." Application at 000025. The Policy also specifically included the owner's "right to change the *owner* or beneficiary" and to do so "at any time before the *insured* dies by *notice* to us." Policy at 000012. Additionally, as Defendant has admitted, "the nominal owner and beneficiary of the Policy has varied." DSUMF ¶ 3. The Policy beneficiary was the Trust, which was then changed to the Kolel, and finally to WSF, as securities intermediary. Regardless of the nominal changes, even if the Kolel has always been the only *actual* beneficiary, the owner's decision not to *exercise* its right to change the beneficiary does not indicate that the owner lacked the power to do so.

In sum, no disputed issue of material fact exists for a reasonable jury to find that the Insured joined with the Kolel in signing the application and named the Kolel as the owner and irrevocable beneficiary of the Policy. Thus, notwithstanding that the Insured may have been a long-standing supporter of the Kolel, the Kolel does not satisfy the requirements for having an insurable interest under N.J.S.A. § 17B:24-1.1(a)(5). Because the Policy at inception was procured for the benefit of a third-party with no insurable interest, the Policy is void *ab initio*. *See Bergman*, 238 N.J. at 190; N.J.S.A. § 17B:30B-18(e)(1).

B. Incontestability Clause and Misrepresentations

Defendant claims that even if there are any misrepresentations in the Policy Application, Plaintiff is barred from raising them because of the Policy's statutorily required two-year incontestability clause. *See* N.J.S.A. § 17B:25-4 ("There shall be a provision that the policy [exclusive of certain provisions] shall be incontestable, except for nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue."). However, "[n]otwithstanding the provisions of N.J.S.17B:25-4, a life insurer may contest a life insurance policy on the grounds that it was obtained by a stranger-originated life insurance practice, ..., at any time." N.J.S.A. § 17B:30B-18(d)); *Bergman*, 238 N.J. at 177 ("an incontestability provision does not bar a challenge to a STOLI policy."). Thus, the incontestability clause does not bar Plaintiff's claim seeking a declaration that the Policy is a STOLI scheme void at the outset.

Likewise, WSF's other affirmative defenses of waiver, estoppel, unclean hands, or laches cannot overcome a life insurance policy that violates public policy and void *ab initio*. *See Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, No. 20-7959, 2021 WL

1712528, at *5 (D.N.J. Apr. 30, 2021) (finding that equitable defenses of laches, waiver and estoppel, and unclean hands cannot be asserted to sustain STOLI arrangement).

Plaintiff's motion for summary judgment declaring the Policy void *ab initio* is **granted.** Defendant's motion for summary judgment to dismiss Plaintiff's Amended Complaint is **denied.**

### C. Return of Premiums

If the Policy is declared void *ab initio*, Defendant seeks a return of all of its premium payments. As a threshold matter, Plaintiff contends that Defendant waived this issue by failing to assert it as a counterclaim and instead raising it for the first time in its opposition to Plaintiff's motion for summary judgment. As evidenced in each of the cases cited by Defendant, the return of premiums is typically pled as a counterclaim. *See e.g., Lincoln Nat'l*, 2026 WL 1679179, at *3; *Sun Life*, 2016 WL 5746352, at *1. However, Defendant asserted unjust enrichment as an affirmative defense, which sufficed to provide Plaintiff with notice. *See* Answer, Thirteenth Affirmative Defense ¶ 53, ECF No. 25. *See e.g., Cevdet Aksut Ve Ogullari Koll. Sti v. Cavusoglu*, No. 12-2899 (WJM), 2016 WL 231018, at *5 (D.N.J. Jan. 19, 2016) (noting that "Sixth Affirmative Defense intimated that a defense of comparative negligence could be raised, thus further mitigating any potential prejudice to the Plaintiff"), *aff'd sub nom. Cevdet Askut Ve Ogullari Koll, STI v. Cavusoglu*, 704 F. App'x 137 (3d Cir. 2017), *judgment entered*, No. 16-1687, 2017 WL 4359054 (3d Cir. July 11, 2017).

Under the "traditional rule," "courts leave the parties to a void contract as they are rather than assist an illegal contract." *Bergman*, 238 N.J. at 188. But as an exception to that general rule, "a party may be entitled to a refund of premium payments it made on a void STOLI policy, particularly a later purchaser who was not involved in any illicit conduct. *Id.* at 190. When deciding the appropriate remedy in the context of a void STOLI policy, courts are to employ a "fact-sensitive approach" in which trial courts should "balance the relevant equitable factors" including "a party's level of culpability, its participation in or knowledge of the illicit scheme, and its failure to notice red flags." *Id.*

Defendant argues that it is entitled to a refund because Plaintiff has presented no evidence that the Kolel engaged in any intentional fraud or wrongdoing. To show a lack of culpability, Defendant explains that the Kolel's failure to disclose its involvement to the insurer was due to its lack of understanding that that was necessary. *See* Babad Tr. at 84:24-85:4. But regardless of whether the Kolel's failure to disclose was intentional or not, the fact remains that the Kolel was the undisputed intended beneficiary yet clearly failed to satisfy the statutory requirements of an insurable interest under N.J.S.A. § 17B:24-1.1(a)(5). Because the Trust neither funded the Policy nor was the intended beneficiary, there was at the inception only feigned compliance with the statutory insurable interest requirement. *See* discussion *supra*. Thus, the payments made by the Kolel to the insurer by depositing money into the family irrevocable Trust from the initial premium through 2011 are not refundable. Plaintiff shall retain those premium payments totaling $427,322.75.

However, notwithstanding the Kolel's failure to comply with N.J.S.A. § 17B:24-1.1(a)(5), the Court is mindful that the premium refund request is ultimately "an equitable remedy and the Court must look at the outcome to determine the fairness of the result." *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, NA*, No. 14-05789, 2016 WL 6824367, at *2 (D.N.J. Nov. 17, 2016), *aff'd*, 779 F. App'x 927 (3d Cir. 2019). In balancing the relevant equitable factors, the Court considers that this is not a typical STOLI scheme where, consistent with an attempt to conceal a fraud, the intended beneficiary disputes that it was always the intended beneficiary. There is no evidence in the record that the Kolel knew of any illicit scheme regarding the Policy, failed to notice red flags, or that it intended to mislead the Insurer. *See* Babad Aff. ¶ 17. Indeed, it is uncontested that Bienenstock was a long-time supporter of the Kolel and was fully aware of and even agreed with Babad at the outset that the Kolel would procure, pay for, and receive the benefits of a life insurance policy on his life. Plaintiff, however, maintains that because the Kolel failed to plead a premium refund counterclaim, it was prejudiced by not being able to take discovery on the Kolel's knowledge, belief, or ability to control its licensing agent as those issues would not have been relevant. But given that Defendant asserted unjust enrichment as an affirmative defense and that Plaintiff must have been aware that that issue would involve a consideration of equities, the Court is not persuaded that Plaintiff could not have sought discovery on the Kolel's culpability.

Moreover, notwithstanding that changes to the Policy's beneficiary were contractually permissible, by May 2011, having confirmed the Policy's ownership and beneficiary changes, the Insurer not only knew of the Kolel's involvement but beginning in 2012, also accepted premium payments directly from the Kolel. Finally, allowing Plaintiff to keep more than $2 million in premiums would be unjust as it would result in a windfall. Accordingly, Plaintiff shall return the premiums paid beginning in 2012 after the Policy beneficiary was changed to the Kolel and the Kolel began to make payments directly to the insurer. *See Sun Life*, 2016 WL 5746352, at *12 (granting premium refund in part because permitting insurer to keep premiums would be unfair windfall). The Court calculates those premiums to be $1,623,165.04, which are to be refunded to the Kolel.

## IV.    CONCLUSION

Defendant has not met its burden to show that there are any genuine issues of material facts upon which a reasonable jury could find that the Kolel had an insurable interest under N.J.S.A. § 17B:24-1.1(a)(2), (4), or (5). Defendant's summary judgment motion is **denied.** Plaintiff's motion for summary judgment is **granted.** The Policy insuring the life of Alexander Bienenstock is declared void *ab initio* for lack of insurable interest. Defendant's request for a refund of its premium payments is **granted in part and denied in part.**

WILLIAM J. MARTINI, U.S.D.J.

Date: June 21, 2026

11